CRAIG P. FAGAN, State Bar No. 149556
**LAW OFFICES OF CRAIG P. FAGAN**
4512 4th Street
La Mesa, CA 91941
Telephone: (619) 528-9600
Facsimile:   (619) 303-4814
email: cpfagan@faganlegal.com

Attorneys for all Plaintiffs

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| JOSEPH COOK, an Individual, LIRVANEETHZA COOK, an Individual,  Plaintiffs,   v.  FULLERTON SUPPORTIVE HOUSING, L.P., A California Limited Partnership; THE JOHN STEWART COMPANY, A California Corporation; and  DOES 1 through 10, Inclusive,  Defendants | No.  **COMPLAINT FOR MONETARY, DECLARATORY, AND INJUNCTIVE RELIEF; DEMAND FOR TRIAL BY JURY** |

**I.**

**INTRODUCTION**

1. This action seeks monetary, declaratory, and injunctive relief against defendants for discriminating against plaintiffs on the base of race in the operation of the Fullerton Heights Apartments, located at 1220 East Orangethorpe Avenue, Fullerton, CA 92831 (hereinafter "the Subject Property" or "the complex") for coercing, intimidating, threatening, or interfering with plaintiffs in the exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by the Fair Housing Act and/or the Fair Employment and Housing Act in violation of the Fair Housing Act of 1968, as amended, 42 U.S.C. §§3601 *et seq.*, and related federal and state laws, and by refusing to intercede a stop racism by a tenant against Plaintiffs.

**II.**

**JURISDICTION AND VENUE**

2. Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. §1331 in that the claims alleged herein arise under the laws of the United States. This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 to hear and determine Plaintiffs' state law claims because those claims are related to Plaintiffs' federal law claims and arise out of a common nucleus of related facts. Plaintiffs' state law claims are related to Plaintiffs' federal law claims such that those claims form part of the same case or controversy under Article III of the United States Constitution.

3. Venue is proper in that the claims alleged herein arose within the City of Fullerton, Orange County, California.

# III.

# PARTIES

4. Plaintiffs Joseph Cook and Lirvaneethza Cook, husband and wife, live with their children at the Subject Property in Fullerton, Orange County, California.

5. Defendant Fullerton Supportive Housing, L.P., is a California Limited Partnership, and has been the owner of the Subject Property since October 16, 2014. The principal place of business of Defendant Fullerton Supportive Housing, L.P., is in Los Angeles, Los Angeles County, California.

6. Defendant The John Stewart Company, A California Corporation, has managed the Subject Property at all times herein, and has been hired in such capacity by Defendant Fullerton Supportive Housing, L.P. Defendant The John Stewart Company's lists its principal place of business as being San Francisco, San Francisco County, California.

7. Each defendant is, and at all times herein relevant was, the agent, employee, or representative of each other defendant, in doing the acts or in omitting to act as alleged in this compliant, was acting within the course and scope of his or her actual or apparent authority pursuant to such agency; or the alleged acts or omissions of each defendant as agent were subsequently ratified and adopted by each defendant as principal.

# IV.

# FACTS

8. Defendants, acting individually and in concert with others, directly and through agents, have engaged in a pattern or practice of discrimination against plaintiffs because of race, including Plaintiffs, in the operation of the Subject Property. Defendants continue to engage in such a pattern or practice of discrimination so as to constitute a continuing violation.

9. In August 2018, Joseph Cook and Lirvaneethza Cook, husband and wife, moved into

1  the Fullerton Heights Apartments, located at 1220 East Orangethorpe Avenue, Fullerton, CA 92831
2  (hereinafter "the Subject Property" or "the complex"), along with their minor children.
3         10.    Joseph Cook is African-American.  Lirvaneethza Cook is Hispanic.
4         11.    Defendant The John Stewart Company manages the property.  At all times since
5  Plaintiffs moved into the Subject Property, Defendant The John Stewart Company has been hired by
6  Defendant Fullerton Supportive Housing, L.P. to manage the Subject Property.
7         12.    Before moving in, Plaintiffs met with the resident managers of the complex, Melissa
8  and Jessica (last names unknown).  Plaintiffs are informed and believe and thereon allege that Melissa and
9  Jessica are employed in such capacity by Defendant The John Stewart Company.  Prior to moving in,
10 Plaintiffs met with the resident managers to fill out paperwork, and to discuss their tenancy. Mrs. Cook
11 was pregnant at the time.  At one point, Jessica asked who would be living at the property.  Mr. Cook
12 indicated that they had 5 children that would live with them, and that they co-parent two other children.
13 Jessica and Melissa were fully aware of this fact, and had no objection.
14        13.    Plaintiffs were given an upstairs, 3-bedroom, 2-bath apartment.
15        14.    The neighbor below Plaintiffs is Susan Gurrola.  She moved in at about the same
16 time as Plaintiffs.
17        15.    Two days after moving in, at about 3 p.m., Plaintiffs' children were playing in the
18 apartment. Mr. Cook was home.  While playing, one of the kids dropped something on the floor. Without
19 warning, Ms. Gurrola stormed up the stairs, aggressively pounded on the door, then said, "Your fucking
20 kids are too loud, and I have to go to work.  You need to keep the noise down."  Mr. Cook was shocked,
21 and apologized.  Ms. Gurrola stormed off.
22        16.    Two days later, Mr. Cook's grandmother came to babysit Plaintiffs' kids.  Mr.
23 Cook's grandmother is Caucasian.  At about 4 p.m., Ms. Gurrola yelled obscenities from below, to quiet
24 the children down.
25        17.    Later that day, Mr. Cook was walking through the front gate, and saw Ms. Gurrola,
26 who was outside smoking.  Upon seeing Mr. Cook, Ms. Gurrola said, "Your grandmother is a race traitor."
27 Mr. Cook said nothing, and walked past.  As he passed, Ms. Gurrola continued to emphasis the term,
28

saying, "Race traitor, race traitor, race traitor."

18. The next day, a Monday, Plaintiffs went to the office to speak to the resident manager, Melissa, to tell her what had transpired over the last few days (the office was closed on weekends). When Plaintiffs arrived, Ms. Gurrola was at the office, complaining to Melissa about something. After Ms. Gurrola left, Plaintiffs told Melissa about everything that had happened over the last several days, including the racial comments. In response, Melissa asked Plaintiffs if they could be peaceful with the neighbor, and to have zero contact with her. Plaintiffs agreed to do so.

19. A few days later, a neighbor's young child was wondering the premises early in the morning. Ms. Cook saw this, and went to help the child. She then contacted on-site security to help. Thereafter, the security officer and Ms. Cook started knocking on doors, to see whose child this was. During this time, they knocked on Ms. Gurrola's door. When the security guard asked Ms. Gurrola if she knew the child, she looked at Ms. Cook and said, "That lady is a fucking bitch. She's going to get kicked out for having too many kids, and disturbing my peace."

20. About a week later, Ms. Cook was sitting in her car, waiting to pull out of her garage. Ms. Gurrola was driving into the complex at this time, and aggressively drove past Ms. Cook, almost hitting her. Ms. Cook drove off toward the complex exit. After Ms. Cook drove away, Ms. Gurrola turned around and drove after Ms. Cook, rushing up behind her bumper, and honking incessantly for 30 or 40 seconds. Ms. Cook was shocked, but drove away safely.

21. At this time, a friend of Ms. Cook's, an African American woman named Jill, came to visit Plaintiffs from Canada, spending two nights. Jill is also the cousin of Mr. Cook. Jill is a smoker. At the complex, there is an assigned smoking designated area. Whenever Jill needed to smoke, she would go to this area to smoke. On several occasions over the few days, she encountered Ms. Currola smoking in the smoking area. On one occasion, Ms. Cook walked Jill down to the smoking area, to show her where it was. Ms. Currola was in the smoking area, smoking. It was at night. As Ms. Cook and Jill approached, Ms. Gurrola just randomly declared out loud, "Slut." Jill was shocked and said, "Excuse me, are you talking to me?" Ms. Cook told Jill to ignore it. Jill said to Ms. Gurrola, "Are you talking to me or my friend?" Ms. Gurrola laughed, then said, "You're getting fucking kicked out. You're out of here." Ms.

Cook said, "What makes you think we are getting kicked out?" Ms. Gurrola said, "You have too many fucking kids up there. Your fucking nigger husband is a lame." Upon hearing this, Jill got upset, and began to record Ms. Currola on camera. Thereafter, Ms. Gurrola said, "Uh huh, fucking nigger. Yeah, take a fucking picture, bitch. How many fucking baby daddies? I have one, bitch." Jill and Ms. Gurrola exchange some more words, before Ms. Cook and she left.

22. Immediately, Ms. Cook found the security guard, told him what had happened, then asked him to interceded and help. The security guard said, "You need to tell management. It's getting out of hand." Ms. Cook told him to tell management, and he agreed to do so. The security guard did not talk to Ms. Currola about this incident, nor did he contact Ms. Cook to let her know that he had spoken to management.

23. Later that night, Ms. Currola called the police on Plaintiffs. The police came and spoke to Plaintiffs. The officer said, "We got a call. Someone called and said someone used a racial slur." Plaintiffs showed the video of Ms. Currola cussing, using racial insults. The police apologized, and asked Plaintiffs to keep a low profile.

24. Thereafter, Plaintiffs attempted to obtain a restraining order against Ms. Gurrola, with the court setting a future hearing date.

25. After filing paperwork, Ms. Cook and her friend, Jill, went to the office, to speak to Melissa, to let her know about the racial slur, and the incidents that had recently happened. Melissa wasn't in the office, but her mother was in the office, running the office. During this meeting, the mother asked, "Did you call her white trash?" Ms. Cook admitted that Jill said this, but only after Ms. Currola had hurled racial slurs. At this moment, Ms. Cook showed the videotape to Melissa's mother of Ms. Currola making racial slurs, and explained everything that had happened. After seeing the tape, Melissa's mother said that she'd set up a meeting with Melissa.

26. About an hour later, Melissa's mother and Melissa's adult daughter (who manages a separate property) came to Plaintiffs' unit. The adult daughter works for The John Stewart Company, as well. Mr. and Ms. Cook were home. During this meeting, they showed the granddaughter the video tape. She left shortly thereafter.

27. A day or two later, Plaintiffs met with Melissa at the office. During this meeting, they told Melissa that they had filed paperwork to get a restraining order against Ms. Currola. They also showed Melissa the video. Melissa asked, "Do you think she's racist?" Mr. Cook said it seemed like it. Melissa then said, "Is there a way for you guys to co-habitate, and get along?" Mr. Cook said that it was unlikely. In response, Melissa said, "If I have to take any action against Ms. Currola, then you would have to leave too. It's only fair. We'd have to get rid of you, too." During this meeting, Melissa said that she had spoken to Ms. Currola, and Ms. Currola was hurt for what Jill had said to her. Melissa told Plaintiffs that Jill was not allowed to visit the complex for 30 days. Plaintiffs were shocked and passively said nothing.

28. Thereafter, Plaintiffs cancelled their restraining order hearing. Plaintiffs cancelled it because they did not want to get evicted if they went forward with the restraining order.

29. These incidents caused extreme duress to plaintiffs, as Mr. Cook went to the doctor because his blood pressure was extremely high. Ms. Cook was also distressed, as she was set to give birth soon. During this time, Ms. Cook also had shingles, due to the stress.

30. Thereafter, in or about September 2018, Melissa set up a meeting with Ms. Currola and Plaintiffs. A woman named Sarah, from Pathways of Hope, was present for the meeting. Pathways of Hope was an organization that had assisted Plaintiffs in finding their current apartment. At this meeting, Sarah was brought in to help. The meeting lasted less than 10 minutes. Ms. Currola said she had to leave shortly after the meeting started. Everybody sat in one room together. Melissa said, "You guys need to get along. If you can't work it out, I don't want to take action against you." Ms. Currola said, "There are too many people in their unit. It's too loud." Melissa said that they would get rid of Plaintiffs if they didn't stop. During this meeting, the Cooks told Melissa that on an almost daily basis Ms. Currola would say things to them, including making racial terms (such as "nappy headed kids" or "mixed babies" or "nigger shit"). Mr. Cook informed Melissa that his kids were scared of Ms. Currola, and were afraid to take the elevator, as it opened near Ms. Currola's unit. Melissa then asked Ms. Currola if she could get along. Ms. Currola said, "Yes, but only if they can stop making noise at 2 a.m." Ms. Currola then promptly left the meeting. Mr. Cook then explained to Melissa that he did not make noise at 2 a.m, only

during reasonable hours. Mr. Cook explained that he has tried everything in his power to work with the management company, and Ms. Currola, and to maintain his good character. He then said it made him upset that Ms. Currola's word was taken at face value, but his wasn't. Melissa then said, "Can you forgive and get along?" There was no effort made by Melissa to address Ms. Currola's racial hostility toward Plaintiffs.

31. For the next several months, Plaintiffs avoided Ms. Currola as much as possible, and tried to keep the peace. However, during this time, neighbors would relay to Plaintiffs that Ms. Currola continued to make racial slurs about them. During this time, Plaintiffs regularly spoke with the resident manager, Jessica, telling her what tenants were saying. Jessica did nothing to intervene, and stop Ms. Currola's racial slurs.

32. In December 2018, Ms. Currola started calling the police on Plaintiffs constantly, complaining about alleged noise coming from Plaintiffs' unit. The claims were frivolous.

33. During this time, Jessica informed Plaintiffs that Ms. Currola complained to her almost every day about noise in their unit. Mr. Cook said, "I can't even go to the laundry room because there's too much gossip from neighbors about what Ms. Currola said." Mr. Cook told Jessica that the comments made by Ms. Currola were racial. Jessica said, "I know it's uncomfortable, but I don't like dealing with this either." Jessica then said that she felt uncomfortable when Ms. Currola would call the cops, and Jessica would have to speak to them. Mr. Cook replied, "That's my life. You don't like it and the cops only came twice to your house. They've been to my house two dozen times. We have never been given a citation. It's just harassment. The cops come, see that there's nothing wrong, then leave." Jessica said, "It's unfortunate. I'm going to set up a meeting, and have Sarah come out and have a meeting with you guys."

34. About a week later, Jessica and Sarah met with the Cooks. Ms. Currola was not invited to the meeting. It was about 2 weeks before Christmas 2018. Jessica started off the meeting by saying, "We are having too much issue with your guys' noise. We have heard the noise a few times, and it is a breach of your lease. We don't want to evict you because it stays on your record. We'd rather you leave on your own. The eviction is coming, I don't know when. When it comes, I'll let you know."

Jessica then said, "I'll try to help you find another place." Jessica said, "You are great tenants. We have no issue with you. If it wasn't for Ms. Currola's complaining, we wouldn't have had an issue with you. You pay your rent, you're clean. I personally like you." During the meeting, Jessica also said, "We didn't know about the amount of children you had. Eviction is coming. I don't know when. You should get out before it comes." Sarah was surprised, then said, "We worked so hard to get them in here. I was under the impression that this meeting was different. I didn't know that you were going to kick them out." Sarah also said to Jessica, "You guys *did* know because I wrote you guys a letter, telling you that I had a family with 6 kids, and that they were pregnant. Now, you are telling them that they have to leave." Jessica made no reference to the ongoing racial hostilities that Ms. Currola had made against Plaintiffs during this meeting.

35. Later that week, Ms. Currola called the police on Plaintiffs multiple times for noise complaints. All of the noise complaints were baseless.

36. On or about December 17, 2018, Mr. Cook hand-delivered a letter to Jessica, indicating that it was illegal for management to refuse to intervene, and stop Ms. Currola's racial hostility. After Jessica read part of the letter, she got upset, and said, "What is this?" She was then rude and off-putting to Mr. Cook. He then said that he was simply expressing his frustrations with management. During this meeting, Jessica called a maintenance guy into the room. Jessica said to the maintenance guy, "You are not supposed to talk to him (Mr. Cook). You're not supposed to be friends with the tenants. You're not supposed to tell other tenants what is said about them." Mr. Cook then said, "If I can't speak to you, then you are going to have to speak to an attorney." Mr. Cook was very civil during this meeting.

37. In early January, Ms. Cook went to pay rent. She spoke with Jessica, and told her that Ms. Currola continued to call the police on them. Jessica did nothing, but reminded her that an eviction was pending.

38. In early February, Ms. Cook went to the office to pay rent. She spoke with Jessica. During this meeting, Jessica told Ms. Cook that it was not her "job description to be dealing with this." Ms. Cook responded by saying, "How do you think we feel? We've been dealing with this since we moved in." Ms. Cook then said, "Susan told me, 'Hey Bitch, enjoy your 30-day notice.' Is this true?" Jessica

then reaffirmed that she was in fact going to be getting a 30-day notice. Ms. Cook tried to get Jessica's help, but she refused.

39. At no time during the entire time of Plaintiffs' tenancy has any Defendant tried to stop Ms. Currola from her racial attacks.

## V.

## INJURIES

40. By reason of defendants' unlawful acts and practices, plaintiffs have suffered loss of important housing opportunities, violation of their civil rights, deprivation of the full use and enjoyment of their tenancy, and emotional distress and physical injury, humiliation and mental anguish, physical distress, impairment of health, fear, stress, including bodily injury such as stomach aches; knots in stomach; head aches; high blood pressure; shingles, sleep loss; feelings of depression, discouragement, dry throat, rise in body temperature, anger, and nervousness; trouble sleeping; and reliving the experience; and other special and general damages according to proof. Accordingly, plaintiffs are entitled to compensatory damages.

41. In doing the acts of which plaintiffs complain, defendants and their agents and employees intentionally or recklessly violated plaintiffs' civil rights. Accordingly, all plaintiffs are entitled to punitive damages.

42. There now exists an actual controversy between the parties regarding defendants' duties under federal and state fair housing laws. Accordingly, all plaintiffs are entitled to declaratory relief.

43. Unless enjoined, defendants will continue to engage in the unlawful acts and the pattern or practice of discrimination described above.

# VI.

# FIRST CLAIM

### (Fair Housing Act)

44. Plaintiffs reallege and incorporate by reference paragraphs 1 through 43 of the complaint herein.

45. Defendants have injured plaintiffs in violation of the federal Fair Housing Act by committing the following discriminatory housing practices:

    A. Refusing to rent after the making of a bona fide offer; refusing to negotiate for the rental of, or otherwise making unavailable or denying, a dwelling to any person because of race, in violation of 42 U.S.C. §3604(a);

    B. Discriminating in the terms, conditions, and privileges of the rental of a dwelling because of or race, including without limitation committing acts of racial discrimination against Plaintiffs and their family, and by refusing to intercede and stop tenant Susan Gurrola from committing acts of racism and making racial slurs toward Plaintiffs and their children because of race, as well as threatening to evict plaintiffs for having complained of such racism, in violation of 42 U.S.C. §3604(b);

    C. Making, printing, or publishing notices, statements, or advertisements, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race, or an intention to make any such preference, limitation, or discrimination in violation of 42 U.S.C. §3604(c);

    D. Coercing, intimidating, threatening, or interfering with persons in their exercise or enjoyment of, or on account of their having exercised or enjoyed, or on account of their having aided or encouraged any other person in the exercise or enjoyment of, any right granted by or protected by the Fair Housing Act in violation of 42 U.S.C. §3617.

## SECOND CLAIM

### (California Fair Employment and Housing Act)

46. Plaintiffs reallege and incorporate by reference paragraphs 1 through 45 of the complaint herein.

47. Defendants have injured plaintiffs in violation of the California Fair Employment and Housing Act by committing the following discriminatory housing practices:

   A. Discriminating in the terms, conditions, and privileges of the rental of a dwelling because of race in violation of California Government Code §§12955(a);

   B. Making, printing, or publishing notices, statements, or advertisements, with respect to the rental of a dwelling that indicates a preference, limitation, or discrimination based on race, or an intention to make any such preference, limitation, or discrimination in violation of California Government Code §12955(c);

   C. Expressing a preference for or limitation on a renter because of race in violation of California Government Code §12955(d);

   D. Harassing, evicting, or otherwise discriminating against any person in the rental of housing accommodations where the dominant purpose is retaliation against a person who, among other things, has opposed practices unlawful under the Fair Employment and Housing Act, in violation of California Government Code §12955(f);

   E. Threatening, intimidating, or interfering with persons in their enjoyment of a dwelling because of race in violation of California Government Code §12955.7.

## THIRD CLAIM

### (California Unruh Civil Rights Act)

48. Plaintiffs reallege and incorporate by reference paragraphs 1 through 47 of the

complaint herein.

49. Defendants have injured the plaintiffs in violation of the Unruh Civil Rights Act, California Civil Code §51 *et seq.* by discriminating against them because of race in the operation of the Subject Property, a business establishment, because of race.

50. Pursuant to the Unruh Civil Rights Act, plaintiffs are entitled to statutory damages, among other remedies, of up to three times their actual damages as determined by the trier of fact, but no less than $4,000.00 for each violation by each defendants.

### FOURTH CLAIM
#### (Negligence)

51. Plaintiffs reallege and incorporate by reference paragraphs 1 through 50 of the complaint herein.

52. Defendants owed plaintiffs a duty to operate the Subject Property in a manner that was free from unlawful discrimination, and to hire, train, supervise, and discipline their employees and themselves to fulfill that duty. Defendants negligently violated that duty by failing and refusing to intercede and stop tenant Susan Gurrola from committing acts or racism and making racial slurs toward Plaintiffs and their children because of race, as well as threatening to evict plaintiffs for having complained of such racism. Defendants' violation of that duty was the result of negligence, including, but not limited to:

A. Defendants' negligent failure to hire persons who were familiar with the requirements of state and federal fair housing laws;

B. Defendants' negligent failure to train their employees and themselves regarding the requirements of state and federal fair housing laws;

C.  Defendants' negligent failure to supervise their employees regarding compliance with the requirements of state and federal fair housing laws; and

D.  Defendants' negligent failure to follow standard, recognized rental practices of the community;

E.  Defendants' negligent failure to exercise the ordinary and reasonable care and diligence required of a housing provider in the operation and management of the subject rental premises; and/or

F.  Defendants' negligent failure to discipline or terminate employees who failed to comply with the requirements of state and federal fair housing rights laws.

53.  As a legal result of defendants' negligent conduct, the plaintiffs have suffered loss of an important housing opportunity, violation of their civil rights, deprivation of the full use and enjoyment of their tenancy, invasion of the private right of occupancy, wrongful eviction, and bodily injury, including severe humiliation, physical and emotional distress.

## FIFTH CLAIM

**(Unfair Business Practices)**

54.  Plaintiffs reallege and incorporate by reference paragraphs 1 through 53 of the complaint herein.

55.  In acting as herein alleged, defendants have engaged in a pattern or practice of unlawful discrimination based upon race in the operation of the Subject Property, a business establishment, and therefore have engaged in acts of unfair competition as the same is defined in California Business & Professions Code §17200 *et seq*.

# VII.

# **PRAYER FOR RELIEF**

WHEREFORE, plaintiffs pray for entry of judgment against defendants that:

1. Awards compensatory and punitive damages according to proof;
2. Declares that defendants have violated the provisions of the applicable federal and state fair housing laws;
3. Enjoins all unlawful practices complained about herein and imposes affirmative injunctive relief requiring defendants, their partners, agents, employees, assignees, and all persons acting in concert or participating with them, to take affirmative action to provide equal housing opportunities to all tenants and prospective tenants regardless of race;
4. Awards statutory damages to plaintiffs pursuant to the Unruh Civil Rights Act;
5. Awards pre-judgment interest and post-judgment interest as provided for by law;
6. Awards costs of suit herein incurred, including reasonable attorneys' fees; and
7. Awards all such other and further relief as the Court may deem proper.


Dated: February 27, 2019             LAW OFFICES OF CRAIG P. FAGAN


                                     By: **/s/Craig P. Fagan**
                                     Craig P. Fagan
                                     Attorneys for all Plaintiffs


# VIII.

# **JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, plaintiffs hereby request a

trial by jury.

Dated: February 27, 2019                    LAW OFFICES OF CRAIG P. FAGAN

                                            By: **/s/Craig P. Fagan**
                                            Craig P. Fagan
                                            Attorneys for all Plaintiffs